# United States Court of Appeals
# for the Federal Circuit

---

**DOUGLAS DYNAMICS, LLC**,
*Plaintiff-Appellant*,

v.

**BUYERS PRODUCTS COMPANY**,
*Defendant-Cross Appellant.*

---

2011-1291, 2012-1046, -1057, -1087, -1088

---

Appeals from the United States District Court for the Western District of Wisconsin in No. 09-CV-0261, Judge William M. Conley.

---

Decided: May 21, 2013

---

AARON T. OLEJNICZAK, Andrus, Sceales, Starke & Sawal, LLP, of Milwaukee, Wisconsin, argued for plaintiff-appellant. With him on the brief were GEORGE H. SOLVESON and EDWARD R. WILLIAMS, JR.

TODD R. TUCKER, Renner, Otto, Boisselle & Sklar, LLP, of Cleveland, Ohio, argued for defendant-cross appellant. With him on the brief were JAY R. CAMPBELL, MARK C. JOHNSON and NICHOLAS J. GINGO.

---

Before RADER, *Chief Judge*, NEWMAN and MAYER, *Circuit Judges*.

Opinion for the court filed by *Chief Judge* RADER.

Dissenting opinion filed by *Circuit Judge* MAYER.

RADER, *Chief Judge.*

Douglas Dynamics, LLC (Douglas) sued Buyers Products Co. (Buyers) for infringement of several patents related to snowplow mounting assemblies. The United States District Court for the Western District of Wisconsin granted summary judgment of non-infringement of U.S. Patent No. Re. 35,700 ('700 Patent) in favor of Buyers. *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 747 F. Supp. 2d 1063 (W.D. Wis. 2010). Following a jury verdict that found U.S. Patent No. 5,353,530 ('530 Patent) and U.S. Patent No. 6,944,978 ('978 Patent) valid and infringed, the district court denied Douglas a permanent injunction and assigned an ongoing royalty. Because the district court applied an erroneous claim construction in granting summary judgment of non-infringement of claim 45 of the '700 Patent, this court reverses. This court also reverses the denial of a permanent injunction against continued infringement of the '978 Patent, and remands for entry of a permanent injunction consistent with this opinion. This court also vacates the district court's ongoing royalty rate for the '530 Patent and the '978 Patent, and remands to establish a new pre-injunction ongoing royalty rate consistent with this opinion. Because the '530 patent has expired, any permanent injunction as to this patent is now moot, and the ongoing royalty ceases to apply after the date of expiration.

## I.

Douglas and Buyers both manufacture snowplow assemblies for mounting on the front of a truck. These companies compete against one another for sales of those assemblies. Douglas commands about sixty percent of the snowplow market and "is recognized as producing good quality, innovative snowplows." J.A. 5. Buyers entered the market in 2007, selling less expensive snowplow

assemblies, which Douglas accuses of infringement. By 2010, Buyers had increased its market share to about 5%.

Douglas's '700 Patent claims a snowplow assembly that can be conveniently mounted on a vehicle and removed as a single unit. The patented features allow the user to remove heavy portions of the snowplow assembly from the front of the vehicle when the plow is not in use, thus reducing stress on the vehicle's suspension. Additionally, the inventive mounting frame does not extend beyond the vehicle's bumper upon removal of the snowplow assembly. This feature reduces the likelihood the mounting frame will inadvertently cause damage because it protrudes beyond the front bumper. Prior art removable assemblies either left a lifting mechanism protruding from the front of the vehicle, required numerous disassembly steps, or required storage in separate parts that could be lost or damaged.

Figure 1 of the '700 Patent depicts a preferred embodiment of the assembly in which the snowplow blade (20) is fixed to an A-frame (22). The A-frame connects to a lift frame (24) via a chain (144) and a mounting plate (76). On the right-hand side of the figure is the mounting frame (16), which can be attached behind the front bumper of a truck. Figure 1 depicts the assembly in the unmounted position, in which the assembly is detached from the mounting frame.



Douglas asserted independent claims 1, 38, and 45 of the '700 Patent against Buyers's SnowDogg Snowplows.

Claim 1 recites:

1. A vehicle mounted snowplow blade assembly comprising

a vehicle having a frame member and a bumper,

a mounting frame fixed to the frame member and located generally behind the bumper,

a snowplow blade assembly including an A-frame and a snowplow blade fixed to the A-frame,

*a lift frame supported by the A-frame,* and

*mounting means for selectively connecting the A-frame to the mounting frame* for pivotable movement about a generally horizontally extending pivot axis and for affording removal of the A-frame and the lift frame from the mounting frame as a unit so as to leave the mounting frame on the vehicle and behind the bumper.

'700 Patent col. 13 ll. 27–42 (emphases added). Independent claim 38 is essentially the same as claim 1.

The district court held that the limitation "a lift frame supported by the A-frame" of claims 1 and 38 requires the A-frame to support the lift frame "in both the mounted and unmounted states." *Douglas Dynamics*, 747 F. Supp. 2d at 1088. Because Buyers's snowplow assemblies have the lift frame supporting the A-frame—the opposite of the claimed configuration—the district court granted summary judgment of noninfringement. *Id.*

Unlike claims 1 and 38, claim 45 of the '700 Patent does not require that the lift frame (also referred to as a

"support frame") be supported by the A-frame. Claim 45 recites:

> 45. A vehicle mounted snowplow blade assembly comprising
>
> a vehicle having a frame member and a bumper,
>
> a mounting frame fixed to the frame member and located generally behind the bumper,
>
> a snowplow blade assembly including an A-frame and a snowplow blade fixed to the A-frame,
>
> *a support frame connected to the A-frame*, and
>
> *wherein the A-frame and the support frame are connected to the mounting frame* for pivotable movement of the A-frame about a generally horizontally extending pivot axis and for affording removal of the A-frame and the support frame from the mounting frame as a unit so as to leave the mounting frame on the vehicle and behind the bumper.

'700 Patent col. 18 ll. 42–57 (emphases added).

The district court construed the limitation "wherein the A-frame and the support frame are connected to the mounting frame" to require that the A-frame and the support frame each be directly connected to the mounting frame. Specifically, the court held that "the invention described in claim 45 requires that the A-frame and the mounting frame each have structures directly attached to them in some manner, such as through welding, that serve as connection points between the two frames." *Douglas Dynamics*, 747 F. Supp. 2d at 1093.

In Buyers's accused products, the A-frame connects to the support frame, which in turn connects to the mounting frame. *Id.* at 1092. The figure below shows Buyers's snowplow assembly, illustrating the indirect connection between the A-frame (pink) and the mounting frame (green) via the support frame (blue).



II.

Claim construction is a matter of law which this court reviews without deference. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1456 (Fed. Cir. 1998) (en banc). "This court reviews the district court's grant or denial of summary judgment under the law of the regional circuit." *Serdarevic v. Advanced Med. Optics, Inc.*, 532 F.3d 1352, 1362 (Fed. Cir. 2008). In this case, the law of the United States Court of Appeals for the Seventh Circuit draws all reasonable inferences in favor of the non-movant in summary judgment cases and determines whether the district court correctly concluded that no reasonable jury could find in favor of the moving party. *See Stoner v. Wisconsin Dep't of Agric., Trade & Consumer Prot.*, 50 F.3d 481, 484 (7th Cir. 1995).

This court finds no error in the district court's construction of claims 1 and 38 as requiring the A-frame to support the lift frame in both the mounted and unmounted states. As the district court noted, claim 9, which depends from claim 1, specifically refers to a state "when

the A-frame is not connected to the mounting frame." '700 Patent col. 14 ll. 11–14. The inventors surely knew ways to recite a limitation that applies only to one state or the other, and the selective reference to the unmounted state in dependent claim 9 implies that claim 1 encompasses both states. Because claims 1 and 38 require the A-frame to support the lift frame in both the unmounted and mounted positions, the district court correctly granted summary judgment of noninfringement to Buyers's snowplows.

The district court erred, however, in construing the term "connected to" in claim 45 to require a *direct* connection between the A-frame and the mounting frame. The plain language of the claim counsels against this narrow interpretation. "[T]he words of a claim 'are generally given their ordinary and customary meaning' . . . that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). "[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which [it] appears, but in the context of the entire patent, including the specification." *Id.* at 1313. While claim terms are understood in light of the specification, a claim construction must not import limitations from the specification into the claims. *Id.* at 1323.

The ordinary meaning of "connected to" encompasses indirect linkages. Indeed, the specification uses variations of the term "connect" to describe indirect connections. For example, the specification states that the snowplow blade "is *connectable* to the mounting frame . . . *through* an A-frame." '700 Patent col. 4 ll. 49–57 (emphasis added); *see also* col. 10 ll. 61–64 (explaining the lift arm moves the A-frame and snowplow blade by way of a "chain connection"). The '700 Patent does not at any point limit the connection between the A-frame and mounting frame to a "direct" connection.

The district court erred by reading claim 45 narrowly to encompass only those connections between the A-frame and the mounting frame specifically described in the specification. *Douglas Dynamics*, 747 F. Supp. 2d at 1093; *see also id.* at 1089–91. The court recognized that the customary meaning of the claim language encompassed indirect connections. Indeed, the trial court opined that "in a very general sense the A-frame is 'connected' to the mounting frame" in Buyers' SnowDogg snowplow assemblies. *Id.* at 1091. Nonetheless, because the specification does not depict the A-frame connected to the mounting frame only by way of the lift frame, and does not explicitly state that the lift frame can be viewed as connecting the A-frame to the mounting frame, the district court found such a configuration outside the scope of the claims. *Id.* at 1089.

To the contrary, the district court's construction would exclude a preferred embodiment of the invention. *Douglas Dynamics*, 747 F. Supp. 2d at 1089. Figure 6 depicts the lift frame connected to the mounting frame not "directly," but via an intermediate removable hitch arm. '700 Patent Fig. 6 & col. 6 ll. 48–64. As shown in Figure 7, this L-shaped hitch arm is separate from both the mounting frame and the lift frame, but serves to indirectly connect the two frames together. *Id.* Fig. 7.

Buyers and the district court suggest that construing claim 45 to encompass connection of the A-frame to the mounting frame via the support frame renders superfluous a limitation requiring the A-frame to be connected to the mounting frame. Specifically, claim 45 recites "a support frame connected to the A-frame, and wherein the A-frame *and* the support frame are connected to the mounting frame . . ." *Id.* col. 18 ll. 50–52 (emphasis added). Because claim 45 already requires connection between the support frame and the A-frame, the district court found it would be redundant to state that both the "A-frame *and* the support frame are connected to the mounting frame" unless separate, direct connections were

intended.   *Id* (emphasis added); *see Douglas Dynamics*, 747 F. Supp. 2d at 1093.  The court reasoned that simply reciting a connection between the support frame and the mounting frame would necessarily imply an indirect connection between the A-frame and the mounting frame. *See Douglas Dynamics*, 747 F. Supp. 2d at 1093.

This court does not view the language as superfluous. Rather, claim 45 requires the A-frame and support frame *unit* to connect to the mounting frame.  This arrangement allows "pivotable movement of the A-frame about a generally horizontal extending pivot axis."   This array also permits "removal of the A-frame and the support frame as a unit."  '700 Patent col. 18 ll. 52–55.  Claim 45 thus recites functional requirements for the connection between the mounting frame and the A-frame/support frame unit.  These requirements can be met by connecting either the A-frame or the support frame, or both, to the mounting frame in the appropriate manner.

In sum, the correct construction of the term "connected to" in claim 45 is not limited to direct connections.  The record shows that Buyers's SnowDogg snowplow assemblies include an A-frame connected to a support frame with the support frame then connected to a mounting frame.  *See Douglas Dynamics*, 747 F. Supp. 2d. at 1092. Buyers has not presented any other arguments against infringement of claim 45.  Accordingly, this court finds the accused products meet every limitation of claim 45 as properly construed.   Therefore, this court reverses the grant of summary judgment of noninfringment and directs the district court to enter summary judgment of infringement in favor of Douglas.

## III.

The district court denied Douglas's request for a permanent injunction against infringement of the '530 and '978 Patents, even though both patents were found infringed and not invalid after summary judgment motions and a jury trial.  On appeal, Buyers concedes validity and infringement of those patents but contends the district

court properly denied a permanent injunction because Buyers does not "directly compete" with Douglas and because the '530 and '978 Patents cover only some components of the accused snowplow assemblies.

While this case was on appeal, the '530 Patent expired. Therefore, an injunction on the technology covered by that patent is moot. The '978 Patent on the other hand remains in force, and for the following reasons, this court reverses the denial of an injunction as to that patent.

This court reviews the denial of a permanent injunction for an abuse of discretion. *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 861 (Fed. Cir. 2010). To be entitled to a permanent injunction, a patentee must show: (1) it has suffered an irreparable injury; (2) remedies available at law are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction. *Id.* (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

Here, the district court concluded that "Douglas has failed to make even a threshold showing of irreparable harm." *Douglas Dynamics, LLC v. Buyers Prods Co.*, (*Denial of Permanent Injunction Order*), No. 09-CV-261 (W.D. Wis. Feb. 25, 2011). Although "the parties here compete for sales of snowplow truck assemblies, along with a number of other manufacturers," the district court found that Douglas suffered no injury because Douglas failed to show it was losing sales or market share to Buyers. The district court relied on evidence that persons willing to pay for a Douglas snowplow were unlikely to purchase a Buyers snowplow as a substitute, and that Douglas's market share increased about 1% a year after Buyers introduced its infringing snowplows.

Simply because a patentee manages to maintain a profit in the face of infringing competition does not automatically rebut a case for irreparable injury. Irreparable

injury encompasses different types of losses that are often difficult to quantify, including lost sales and erosion in reputation and brand distinction. Here, the district court likened Douglas's snowplow to a Mercedes Benz S550 and Buyers's snowplow to a Ford Taurus. *Id.* Indeed, buyers interested in purchasing the Mercedes, when presented with both choices, would not likely switch to the Ford and vice versa. However, if the Ford made its place in the market by infringing on the intellectual property of the Mercedes and capitalized on its similarity to the better product, then the harm to the Mercedes product might go beyond a simple counting of lost sales—some of which would occur anyway if the Ford marketed itself effectively as a "Mercedes at half the price." The Mercedes would lose some of its distinctiveness and market lure because competitors could contend that they had "similar features" without noting that those features infringe Mercedes's proprietary technologies.

Furthermore, the fact that Douglas's market share increased 1% a year after Buyers introduced its infringing snowplow is, at least in this case, immaterial. The record shows that Douglas dedicates significant amounts of time and money towards marketing and sales, engineering, and research and development. Over the years, it has earned itself a reputation in the marketplace as an innovator and trusted supplier of quality snowplows. Stated differently, even with a Ford Taurus announcing that it possessed similar features on the market, Mercedes could maintain or increase its market share for a variety of reasons.

The district court also made a clear error of judgment in its analysis of Douglas's reputation loss. The district court found that Douglas had a reputation as an innovator, yet determined there was no injury because there was no evidence that interested consumers confused the two companies. Even absent consumer confusion, however, there can still be harm to a company's reputation, particularly its perception in the marketplace by customers, dealers, and distributors. As just one example, Douglas's

reputation as an innovator will certainly be damaged if customers found the same "innovations" appearing in competitors' snowplows, particularly products considered less prestigious and innovative. Furthermore, as Buyers's expert agreed, Douglas's reputation would be damaged if its dealers and distributors believed it did not enforce its intellectual property rights. Lastly, the evidence shows that Douglas had never licensed the infringed patents, and intentionally chose not to, so that it could maintain market exclusivity. Exclusivity is closely related to the fundamental nature of patents as property rights. It is an intangible asset that is part of a company's reputation, and here, Douglas's exclusive right to make, use, and sell the patented inventions is under attack by Buyers's infringement.

Where two companies are in competition against one another, the patentee suffers the harm—often irreparable—of being forced to compete against products that incorporate and infringe its own patented inventions. The evidence submitted by Douglas leads this court to conclude Douglas has suffered irreparable injury from Buyers's infringement.

In regard to the remaining equitable factors, this court concludes that, on balance, they also favor entry of a permanent injunction.

This court finds remedies at law inadequate to compensate Douglas for at least the reputation loss Douglas has suffered from Buyers's infringement. Furthermore, this court again disagrees with the district court that Douglas should suffer some penalty for managing through great effort to maintain market share in the face of infringing competition. More relevant is the rise in Buyers's market share from zero to about 5% in three years while infringing Douglas's patents. This record evidence underscores the profitability of infringement and suggests that mere damages will not compensate for a competitor's increasing share of the market, a market which Douglas competes in, and a market that Douglas has in part

created with its investment in patented technology. Lastly, the district court clearly erred in continuing to characterize the '530 and '978 Patents as "minor" even though the '530 Patent is Douglas's only patent that covers the embodiment of the attachment/detachment technology used by Buyers and by Douglas's own Minute Mount products. In fact, the record shows that Buyers's initial attempts to design-around the '530 Patent failed. J.A. 8.

In balancing the hardships between the parties, the district court concluded that "at best, [it was] a wash for Douglas" because Douglas did not lose sales or market share while Buyers would only have to "junk its unsold stock of infringing snowplow assemblies" and design around the patents. J.A. 9-10. In this connection, Buyers represented to the district court that its new design around was ready for implementation. J.A. 8. Having concluded that Douglas has suffered irreparable injury, the district court clearly erred in its balance of the hardships. If indeed Buyers had a non-infringing alternative which it could easily deliver to the market, then the balance of hardships would suggest that Buyers should halt infringement and pursue a lawful course of market conduct.

Finally, regarding the public interest, this court disagrees with the district court's reasoning that "the public may well be better served by having a new competitor, selling cheaper snowplow assemblies in what appears may be an untapped market segment." J.A. 10. Of course, any infringer represents some form of competition with the originator of new technology. Moreover this new "competitor" will often find it easier to avoid the costs and risks of research and development and just "compete" by infringement.

This court agrees with the general premise that competition serves the public interest. Among other things, it ensures competitive pricing and fosters innovation. In the present case, however, Buyers is competing in the marketplace using a competitor's patented technology. For

this reason, it has the advantage of undercutting prices and entering the "untapped market segment" of cheap snowplows. While the general public certainly enjoys lower prices, cheap copies of patented inventions have the effect of inhibiting innovation and incentive. This detrimental effect, coupled with the public's general interest in the judicial protection of property rights in inventive technology, outweighs any interest the public has in purchasing cheaper infringing products. In sum, the public has a greater interest in acquiring new technology through the protections provided by the Patent Act than it has in buying "cheaper knock-offs."

## IV.

In regard to the reasonable royalty award for the '530 and '978 Patents, this court vacates and remands for the following reasons. First, the district court abused its discretion by applying the infamous 25% rule of thumb, which this court held in *Uniloc* was fundamentally flawed. *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011). Second, the district court clearly erred by limiting the ongoing royalty rate based on Buyers's profit margins. This court has held that an infringer's net profit margin is not the ceiling by which a reasonable royalty is capped. *Golight, Inc. v. Wal-Mart Stoares, Inc.*, 355 F.3d 1327, 1338 (Fed. Cir. 2004). The infringer's selling price can be raised if necessary to accommodate a higher royalty rate, and indeed, requiring the infringer to do so may be the only way to adequately compensate the patentee for the use of its technology. Thus, the district court clearly erred by ensuring the ongoing royalty rate it awarded would "leave some room for profit" by Buyers at its current prices.

## V.

For the forgoing reasons, this court reverses the grant of summary judgment of noninfringement as to claim 45 of the '700 Patent. This court reverses the denial of a permanent injunction against continued infringement of

the '978 Patent and instructs the district court to enter a permanent injunction consistent with this opinion. This court also vacates and remands the award of an ongoing royalty for the '530 and '978 Patents.

**REVERSED-IN-PART, VACATED-IN-PART, AND REMANDED.**

# United States Court of Appeals for the Federal Circuit

---

**DOUGLAS DYNAMICS, LLC**,
*Plaintiff-Appellant*,

**v.**

**BUYERS PRODUCTS COMPANY**,
*Defendant-Cross Appellant.*

---

2011-1291, 2012-1046, -1057, -1087, -1088

---

Appeals from the United States District Court for the Western District of Wisconsin in No. 09-CV-0261, Judge William M. Conley.

---

MAYER, *Circuit Judge*, dissenting

I respectfully dissent. Because Douglas Dynamics, LLC ("Douglas") failed to meet the prerequisites for injunctive relief set forth in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006), the district court properly denied its request for a permanent injunction. The trial court also correctly determined that the snowplow assemblies manufactured by Buyers Products Company ("Buyers") do not infringe claim 45 of U.S. Reissue Patent No. 35,700 (the "'700 patent") because that claim requires a direct connection between the snowplow frames. I would affirm.

I.

Because Douglas "failed to make even a threshold showing of irreparable harm or of the inadequacy of a monetary damage award," *Douglas Dynamics, LLC v. Buyers Prods. Co.*, No. 09-CV-261, slip op. at 2 (W.D. Wis. Feb. 25, 2011) ("*Injunction Order*"), the trial court correctly declined to enjoin Buyers from selling the snowplow assemblies that had been found to infringe U.S. Patent No. 6,944,978 (the "'978 patent"). The majority errs in reversing the denial of injunctive relief based on its assumption that "[w]here two companies are in competition against one another, the patentee suffers the harm—often irreparable—of being forced to compete against products that incorporate and infringe its own patented inventions." *Ante* at 12. In the wake of *eBay*, a patentee may no longer rely on the presumption that irreparable injury will result from the continued sale of infringing devices. "An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743, 2761 (2010); *see also Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) ("The Court has repeatedly held that the basis for injunctive relief in the federal courts has always been . . . the inadequacy of legal remedies."). Where, as here, a patentee supplies no evidence that money damages are inadequate to redress any injury from future sales of an infringing product, a trial court acts well within its discretion in denying injunctive relief. *See Voda v. Cordis Corp.*, 536 F.3d 1311, 1319 (Fed. Cir. 2008) (emphasizing that a district court's decision to deny a permanent injunction is reviewed for abuse of discretion).

Prior to *eBay*, the presumption was that a patentee was entitled to a permanent injunction if he established that his patent was not invalid and infringed. *See, e.g., Richardson v. Suzuki Motor Co.*, 868 F.2d 1226, 1247

(Fed. Cir. 1989) ("It is the general rule that an injunction will issue when infringement has been adjudged, absent a sound reason for denying it."). *eBay*, however, rejected this approach, making clear that a permanent injunction should issue only if the traditional four-factor test for injunctive relief is satisfied. 547 U.S. at 391. Under this four-factor test, a litigant is entitled to a permanent injunction only if he establishes that: (1) he has suffered irreparable injury; (2) monetary damages are inadequate to compensate for that injury; (3) considering the balance of hardships between the parties, a remedy in equity is warranted; and (4) the public interest would not be "disserved" by the issuance of a permanent injunction. *Id.*

Here, the trial court, in a thorough and well-reasoned opinion, correctly concluded that Douglas failed to meet the *eBay* prerequisites for injunctive relief. At trial, Douglas was unable to point to a single snowplow sale that had been lost to Buyers. This is because Douglas and Buyers occupy different market segments, with Douglas competing at the high end of the snowplow market and Buyers selling to consumers in the low-cost segment of the market. As the trial court explained, "the parties' competition can be likened to that of Mercedes Benz and Ford, with [Douglas'] snowplows being like the former and Buyers' the latter. While both car companies compete in an open market for sedan-style cars, it is unlikely someone in the market for a Mercedes Benz S550 would also consider purchasing a Ford Taurus, or vice versa." *Injunction Order*, slip op. at 3.

Because Douglas and Buyers compete in different market segments, a customer who was considering the purchase of a Douglas plow would be unlikely instead to purchase a Buyers plow. *See id.* Significantly, as of 2010, Buyers was estimated to have only a 5% share of the snowplow market. Douglas, by contrast, maintained a

market share of approximately 60%, even after Buyers entered the market.  Indeed, since the time Buyers introduced its snowplows into the market in 2007, Douglas' share of the snowplow market has actually increased.  *See id.* at 4.  Douglas is unlikely to suffer any irreparable injury from future snowplow sales by Buyers because the two parties are not direct competitors.  *Injunction Order*, slip op. at 4.  Instead, as the trial court correctly determined, "[v]irtually all of the hard data introduced at trial contradicts [Douglas'] claim that Buyers is one of its three main competitors."  *Id.*  Given that Douglas and Buyers are not direct competitors and Douglas was unable to produce any credible evidence that it was likely to lose profits or market share as a result of future sales of Buyers' low-end plows, the trial court was fully justified in concluding that the failure to issue a permanent injunction would not result in irreparable harm.  *See ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1339 (Fed. Cir. 2012) (concluding that there was no irreparable harm where the parties did "not share a customer base").

Nor was there any reliable evidence establishing that money damages were inadequate to redress Douglas' injury.  Although Douglas argues that its reputation in the industry will be permanently damaged if it is not granted injunctive relief, this contention is belied by the record.  As the trial court correctly noted, "Douglas offered no evidence that Buyers' use of the patented technology in the . . . '978 patent[] ever caused a customer to believe that Buyers' snowplows were somehow connected with, or a version of, [Douglas'] snowplows."  *Injunction Order*, slip op. at 5.  Furthermore, surveys were introduced at trial which showed that snowplow distributors viewed Douglas' plows as very high quality products, but saw Buyers' plows as low quality products.  This evidence served to "confirm[] that distributors selling snowplow assemblies

and the customers buying them readily differentiated between the two brands based principally on quality." *Id.* Significantly, the record contains nothing to indicate that Douglas' reputation and goodwill in the snowplow market would be damaged by the sale of Buyers' remaining infringing snowplows. *Id.* at 6. Contrary to the majority's assertions, the possibility that "Douglas's reputation [could] be damaged if its dealers and distributors believed it did not enforce its intellectual property rights," *ante* at 12, is too speculative to support a finding of irreparable injury. Furthermore, although Douglas complains that its investment in developing the technology disclosed in the '978 patent will be squandered if it is not granted injunctive relief, there is no evidence demonstrating that this investment could not be readily recouped pro rata through imposition of a reasonable royalty. *See ActiveVideo*, 694 F.3d at 1338-39.

Despite the fact that the record contains no evidence indicating that Douglas is likely to lose profits or market share as a result of the sale of Buyers' remaining plows, the majority concludes that irreparable harm should be presumed because a patentee will "often" suffer irreparable injury when it is "forced to compete against products that incorporate and infringe its own patented inventions." *Ante* at 12. To the contrary, however, where infringing sales are made by a party that is not a direct competitor and there is no evidence of lost profits or erosion of market share, the harm suffered by a patentee generally will not be irreparable. Instead, where the damages caused by infringement are "quantifiable and compensable by an ongoing royalty," *ActiveVideo*, 694 F.3d at 1339, there is no irreparable injury and therefore no need for injunctive relief. The majority's analysis fails to recognize "that *eBay* jettisoned the presumption of irreparable harm as it applies to determining the appropriateness of injunctive relief," and that "a successful

patent infringement plaintiff can no longer rely on pre-sumptions or other short-cuts to support a request for a permanent injunction." *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1149 (Fed. Cir. 2011). Here, be-cause Douglas failed to provide any evidence that it was likely to lose profits or market share to Buyers or that money damages were inadequate to compensate for the sale of Buyers' remaining infringing plows, the trial court correctly declined to grant a permanent injunction. *See ActiveVideo*, 694 F.3d at 1338 ("Straight-forward mone-tary harm . . . is not irreparable harm." (footnote omit-ted)).

## II.

The majority errs, moreover, in setting aside the dis-trict court's determination that Buyers' snowplow assem-blies do not infringe claim 45 of the '700 patent. The trial court's determination that claim 45's "connected" limita-tion requires a direct connection between the A-frame and the mounting frame is fully supported by both the plain claim language and the other intrinsic evidence.

Claim 45 specifically provides that the A-frame is "connected to the mounting frame," clearly indicating that the two frames are attached to each other. '700 patent col. 18 ll. 51-52; *see Cat Tech LLC v. TubeMaster, Inc.*, 528 F.3d 871, 884 (Fed. Cir. 2008) ("The appropriate starting point for claim construction is always with the language of the asserted claim itself." (citations and internal quota-tion marks omitted)). In Buyers' snowplow assemblies, however, the A-frame is not attached to the mounting frame, but is instead attached to a support frame, which is then connected to the mounting frame.

Douglas acknowledges that in Buyers' accused plows the A-Frame is not directly connected to the mounting frame. It contends, however, that claim 45's "connected"

limitation is satisfied because the A-frame is connected to the support frame, and the support frame is then connected to the mounting frame. In essence, Douglas argues that the A-frame and the mounting frame are "connected" to each other because they are both attached to a third part. Under Douglas' strained interpretation of the term "connected," the snowplow operator could be deemed to be "connected" to the snowplow blade because the operator's hands rest on the steering wheel and a series of intermediate structures "connect" the steering wheel to the snowplow blade.

Nothing in the specification supports Douglas' tortured reading of the plain claim language. *See Bell Commc'ns Research, Inc. v. Vitalink Commc'ns Corp.*, 55 F.3d 615, 620 (Fed. Cir. 1995) ("[I]t is equally fundamental that claims are to be construed in the light of the specification[] and both are to be read with a view to ascertaining the invention." (citations and internal quotation marks omitted)). To the contrary, the specification discloses only *direct* connections between the A-frame and the mounting frame. As the trial court correctly concluded, "[a] close examination of the specification . . . reveals that it teaches only connections between the [support] frame and the mounting frame and the A-frame and the mounting frame using structures attached directly onto those frames. Neither the specification nor any of the claim language refers to a more removed connection between an A-frame, [support] frame or mounting frame in which one frame's connection to another occurs through a third frame." *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 747 F. Supp. 2d 1063, 1089 (W.D. Wis. 2010).

Furthermore, where the specification describes an "indirect" connection between two parts, it specifically states that the two parts will be connected "through" a third structure:

> A snowplow assembly including a snowplow blade
> . . . connectable to the mounting frame assembly
> *through an A-frame* which extends forwardly from
> the vehicle. A lift frame assembly is pivotally
> connected to the A-frame and is releasably con-
> nectable to the mounting frame assembly.

'700 patent col. 4 ll. 49-54 (diagram numbering omitted)
(emphasis added). Simply put, the inventors used the
word "connected" when they wished to describe two parts
that were directly attached to each other. If, on the other
hand, two parts were not directly attached to each other,
but were instead indirectly attached through a third part,
the inventors stated that the two parts were attached
"through" that third part.* There is nothing in the speci-
fication which would support the majority's view that two
frames can be "connected" to each other simply because
they are both attached to a third frame.

The situation here parallels *Searfoss v. Pioneer Con-
solidated Corp.*, 374 F.3d 1142, 1150 (Fed. Cir. 2004).
There, the patentee argued that the word "connecting"

---

    \* Contrary to the majority's assertions, *see ante* at
8, the trial court's claim construction requiring a direct
connection between the A-frame and the mounting frame
does not exclude an embodiment disclosed in the specifi-
cation. Although the majority contends that the snow-
plow assembly described in figures six and seven of the
specification shows a support frame which is "indirectly"
connected to a mounting frame through a hitch arm, the
specification never states that this indirect attachment is
a "connection." By contrast, the specification makes clear
that the *direct* connection between the lift arm assembly
and the mounting means (which does not include an
intermediate connection through a hitch arm) is a "con-
nection." *See* '700 patent col. 4 ll. 52-54.

could encompass both direct and indirect connections. *Id.* at 1146, 1150. We rejected this argument, however, explaining that the term "connecting" required a direct connection given that "every pertinent figure" contained in the specification "depict[ed] a *direct* connection" between the parts in question. *Id.* at 1150 (emphasis added). A similar analysis applies here. Claim 45 must be construed to require a direct connection between the A-frame and the mounting frame because the specification makes clear that the term "connected" refers to a direct connection between two frames. *See also Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 93 F.3d 1572, 1578 (Fed. Cir. 1996) (refusing to interpret the term "connected to" to encompass indirect connections between two parts).

Douglas' argument that the term "connected" means "indirectly connected" cannot be correct because it would render other language in claim 45 superfluous. *See Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so."); *Power Mosfet Techs., L.L.C. v. Siemens AG*, 378 F.3d 1396, 1410 (Fed. Cir. 2004) (explaining that a claim construction which renders claim terms superfluous is generally disfavored). Claim 45 requires:

> a support frame *connected* to the A-frame, and

> wherein the A-frame and the support frame are *connected* to the mounting frame for pivotable movement of the A-frame about a generally horizontally extending pivot axis and for affording removal of the A-frame and the support frame from the mounting frame as a unit so as to leave the mounting frame on the vehicle and behind the bumper.

'700 patent col. 18 ll. 49-57 (emphasis added).

Claim 45 thus specifically requires that the A-frame be connected to the support frame.  If the A-frame could be deemed to be "connected" to the mounting frame simply because it was attached to the support frame and the support frame was then attached to the mounting frame, there would be no need to additionally specify that the A-frame was connected to the mounting frame.  If all terms in claim 45 are to be given meaning, the word "connected" must be interpreted to require a direct attachment between the A-frame and the mounting frame.