MAYER, Circuit Judge,
dissenting.
I respectfully dissent. Because Douglas Dynamics, LLC (“Douglas”) failed to meet the prerequisites for injunctive relief set forth in eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006), the district court properly denied its request for a permanent injunction. The trial court also correctly determined that the snowplow assemblies manufactured by Buyers Products Company (“Buyers”) do not infringe claim 45 of U.S. Reissue Patent No. 35,700 (the “'700 patent”) because that claim requires a direct connection between the snowplow frames. I would affirm.
I.
Because Douglas “failed to make even a threshold showing of irreparable harm or of the inadequacy of a monetary damage award,” Douglas Dynamics, LLC v. Buy *1347 ers Prods. Co., No. 09-CV-261, slip op. at 2 (W.D.Wis. Feb. 25, 2011) (“Injunction Order”), the trial court correctly declined to enjoin Buyers from selling the snowplow assemblies that had been found to infringe U.S. Patent No. 6,944,978 (the “'978 patent”). The majority errs in reversing the denial of injunctive relief based on its assumption that “[wjhere two companies are in competition against one another, the patentee suffers the harm— often irreparable—of being forced to compete against products that incorporate and infringe its own patented inventions.” Ante at 1345. In the wake of eBay, a patentee may no longer rely on the presumption that irreparable injury will result from the continued sale of infringing devices. “An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course.” Monsanto Co. v. Geertson Seed Farms, — U.S. -, 130 S.Ct. 2743, 2761, 177 L.Ed.2d 461 (2010); see also Weinberger v. Romero-Barcelo, 456 U.S. 305, 312, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982) (“The Court has repeatedly held that the basis for injunctive relief in the federal courts has always been ... the inadequacy of legal remedies.”). Where, as here, a patentee supplies no evidence that money damages are inadequate to redress any injury from future sales of an infringing product, a trial court acts well within its discretion in denying injunctive relief. See Voda v. Cordis Corp., 536 F.3d 1311, 1319 (Fed.Cir.2008) (emphasizing that a district court’s decision to deny a permanent injunction is reviewed for abuse of discretion).
Prior to eBay, the presumption was that a patentee was entitled to a permanent injunction if he established that his patent was not invalid and infringed. See, e.g., Richardson v. Suzuki Motor Co., 868 F.2d 1226, 1247 (Fed.Cir.1989) (“It is the general rule that an injunction will issue when infringement has been adjudged, absent a sound reason for denying it.”). eBay, however, rejected this approach, making clear that a permanent injunction should issue only if the traditional four-factor test for injunctive relief is satisfied. 547 U.S. at 391, 126 S.Ct. 1837. Under this four-factor test, a litigant is entitled to a permanent injunction only if he establishes that: (1) he has suffered irreparable injury; (2) monetary damages are inadequate to compensate for that injury; (3) considering the balance of hardships between the parties, a remedy in equity is warranted; and (4) the public interest would not be “disserved” by the issuance of a permanent injunction. Id.
Here, the trial court, in a thorough and well-reasoned opinion, correctly concluded that Douglas failed to meet the eBay prerequisites for injunctive relief. At trial, Douglas was unable to point to a single snowplow sale that had been lost to Buyers. This is because Douglas and Buyers occupy different market segments, with Douglas competing at the high end of the snowplow market and Buyers selling to consumers in the low-cost segment of the market. As the trial court explained, “the parties’ competition can be likened to that of Mercedes Benz and Ford, with [Douglas’] snowplows' being like the former and Buyers’ the latter. While both car companies compete in an open market for sedan-style cars, it is unlikely someone in the market for a Mercedes Benz S550 would also consider purchasing a Ford Taurus, or vice versa.” Injunction Order, slip op. at 3.
Because Douglas and Buyers compete in different market segments, a customer who was considering the purchase of a Douglas.plow would be unlikely instead to purchase a Buyers plow. See id. Significantly, as of 2010, Buyers was estimated to have only a 5% share of the snowplow market. Douglas, by contrast, maintained *1348 a market share of approximately 60%, even after Buyers entered the market. Indeed, since the time Buyers introduced its snowplows into the market in 2007, Douglas’ share of the snowplow market has actually increased. See id. at 4. Douglas is unlikely to suffer any irreparable injury from future snowplow sales by Buyers because the two parties are not direct competitors. Injunction Order, slip op. at 4. Instead, as the trial court correctly determined, “[virtually all of the hard data introduced at trial contradicts [Douglas’] claim that Buyers is one of its three main competitors.” Id. Given that Douglas and Buyers are not direct competitors and Douglas was unable to produce any credible evidence that it was likely to lose profits or market share as a result of future sales of Buyers’ low-end plows, the trial court was fully justified in concluding that the failure to issue a permanent injunction would not result in irreparable harm. See ActiveVideo Networks, Inc. v. Verizon Commc’ns, Inc., 694 F.3d 1312, 1339 (Fed.Cir.2012) (concluding that there was no irreparable harm where the parties did “not share a customer base”). -
Nor was there any reliable evidence establishing that money damages were inadequate to redress Douglas’ injury. Although Douglas argues that its reputation in the industry will be permanently damaged if it is not granted injunctive relief, this contention is belied by the record. As the trial court correctly noted, “Douglas offered no evidence that Buyers’ use of the patented technology in the ... '978 patent[] ever caused a customer to believe that Buyers’ snowplows were somehow connected with, or a version of, [Douglas’] snowplows.” Injunction Order, slip op. at 5. Furthermore, surveys were introduced at trial which showed that snowplow distributors viewed Douglas’ plows as very high quality products, but saw Buyers’ plows as low quality products. This evidence served to “confirm[] that distributors selling snowplow assemblies and the customers buying them readily differentiated between the two brands based principally on quality.” Id. Significantly, the record contains nothing to indicate that Douglas” reputation and goodwill in the snowplow market would be damaged by the sale of Buyers’ remaining infringing snowplows. Id. at 6. Contrary to the majority’s assertions, the possibility that “Douglas’s reputation [could] be damaged if its dealers and distributors believed it did not enforce its intellectual property rights,” ante at 1345, is too speculative to support a finding of irreparable injury. Furthermore, although Douglas complains that its investment in developing the technology disclosed in the '978 patent will be squandered if it is not granted injunctive relief, there is no evidence demonstrating that this investment could mot be readily recouped pro rata through imposition of a reasonable royalty. See ActiveVideo, 694 F.3d at 1338-39.
Despite the fact that the record contains no evidence indicating that Douglas is likely to lose profits or market share as a result of the sale of Buyers’ remaining plows, the majority concludes that irreparable harm should be presumed because a patentee will “often” suffer irreparable injury when it is “forced to compete against products that incorporate and infringe its own patented inventions.” Ante at 1345. To the contrary, however, where infringing sales are made by a party that is not a direct competitor and there is no evidence of lost profits or erosion of market share, the harm suffered by a patentee generally will not be irreparable. Instead, where the damages caused by infringement are “quantifiable and compensable by an ongoing royalty,” ActiveVideo, 694 F.3d at 1339, there is no irreparable injury and therefore no need for injunctive relief. The majority’s analysis fails to recognize “that eBay jettisoned the presumption of *1349 irreparable harm as it applies to determining the appropriateness of injunctive relief,” and that “a successful patent infringement plaintiff can no longer rely on presumptions or other short-cuts to- support a request for a permanent injunction.” Robert Bosch LLC v. Pylon Mfg. Corp., 659 F.3d 1142, 1149 (Fed.Cir.2011). Here, because Douglas failed to provide any evidence that it was likely to lose profits or market share to Buyers or that money damages were inadequate to compensate for the sale of Buyers’ remaining infringing plows, the trial court correctly declined to grant a permanent injunction. See ActiveVideo, 694 F.3d at 1338 (“Straight-forward monetary harm ... is not irreparable harm.” (footnote omitted)).
II.
The majority errs, moreover, in setting aside the district court’s determination that Buyers’ snowplow assemblies do not infringe claim 45 of the '700 patent. The trial court’s determination that claim 45’s “connected” limitation requires a direct connection between the A-frame and the mounting frame is fully supported by both the plain claim language and the other intrinsic evidence.
Claim 45 specifically provides that the A-frame is “connected to the mounting frame,” clearly indicating that the two frames are attached to each other. '700 patent col. 18 11. 51-52; see Cat Tech LLC v. TubeMaster, Inc., 528 F.3d 871, 884 (Fed.Cir.2008) (“The appropriate starting point for claim construction is always with the language of the asserted claim itself.” (citations and internal quotation marks omitted)). In Buyers’ snowplow assemblies, however, the A-frame is not attached to the mounting frame, but is instead attached to a support frame, which is then connected to the mounting frame.
Douglas acknowledges that in Buyers’ accused plows the A-Frame is not directly connected to the mounting frame. It contends, however, that claim 45’s “connected” limitation is satisfied because the A-frame is connected to the support frame, and the support frame is then connected to the mounting frame. In essence, Douglas argues that the A-frame and the mounting frame are “connected” to each other because they are both attached to a third part. Under. Douglas’ strained interpretation of the term “connected,” the snowplow operator could be deemed to be “connected” to the snowplow blade because the operator’s hands rest on the steering wheel and a series of intermediate structures “connect” the steering wheel to the snowplow blade.
Nothing in the specification supports Douglas’ tortured reading of the plain claim language. See Bell Commc’ns Research, Inc. v. Vitalink Commc’ns Corp., 55 F.3d 615, 620 (Fed.Cir.1995) (“[I]t is equally fundamental that claims are to be construed in the light of the specification! ] and both are to be read with a view to ascertaining the invention.”, (citations and internal quotation marks omitted)). To the contrary, the specification discloses only direct connections between the A-frame and the mounting frame. As the trial court correctly concluded, “[a] close examination of the specification ... reveals that it teaches only connections between the [support] frame and the mounting frame and the A-frame and the mounting frame using structures attached directly onto those frames; Neither the specification nor any of the claim language refers to a more removed connection between an. A-frame, [support] frame or mounting frame in which one frame’s connection to another occurs through a third frame.” Douglas Dynamics, LLC v. Buyers Prods. Co., 747 F.Supp.2d 1063, 1089 (W.D.Wis.2010).
*1350 Furthermore, where the specification describes an “indirect” connection between two parts, it specifically states that the two parts will be connected “through” a third structure:
A snowplow assembly including a snowplow blade ... connectable to the mounting frame- assembly through an A-frame which extends forwardly from the vehicle. A lift frame assembly is pivot-ally connected to the A-frame and is releasably connectable to the mounting frame assembly.
'700 patent col. 4 11. 49-54 (diagram numbering omitted) (emphasis added). Simply put, the inventors used the word “connected” when they wished to describe two parts that were directly attached to each other. If, on the other hand, two parts were not directly attached to each other, but were instead indirectly attached through a third part, the inventors stated that the two parts were attached “through” that third part.* There is nothing in the specification which would support the majority’s view that two frames can be “connected” to each other simply because they are both attached to a third frame.
The situation here parallels Searfoss v. Pioneer Consolidated Corp., 374 F.3d 1142, 1150 (Fed.Cir.2004). There, the patentee argued that the word “connecting” could encompass both direct and indirect connections. Id. at 1146,1150. We rejected this argument, however, explaining that the term “connecting” required a direct connection given that “every pertinent figure” contained in the specification “depict[ed] a direct connection” between the parts in question. Id. at 1150 (emphasis added). A similar analysis applies here. Claim 45 must be construed to require a direct connection between the A-frame and the mounting frame because the specification makes clear that the term “connected” refers to a direct connection between two frames. See also Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp., 93 F.3d 1572, 1578 (Fed.Cir.1996) (refusing to interpret the term “connected to” to encompass indirect connections between two parts).
Douglas’ argument that the term “connected” means “indirectly connected” cannot be correct because it would render other language in claim 45 superfluous. See Merck & Co. v. Teva Pharms. USA Inc., 395 F.3d 1364, 1372 (Fed.Cir.2005) (“A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so.”); Power Mosfet Techs., L.L.C. v. Siemens AG, 378 F.3d 1396, 1410 (Fed.Cir.2004) (explaining that a claim construction which renders claim terms superfluous is generally disfavored). Claim 45 requires:
a support frame connected to the A-frame, and
wherein the A-frame and the support frame are connected to the mounting frame for pivotable movement of the A-frame about a generally horizontally extending pivot axis and for affording removal of the A-frame and the support frame from the mounting frame as a unit so as to leave the mounting frame on the vehicle and behind the bumper.
*1351 '700 patent col. 18 II. 49-57 (emphasis added).
Claim 45 thus specifically requires that the A-frame be connected to the support frame. If the A-frame could be deemed to be “connected” to the mounting frame simply because it was attached to the support frame and the support frame was then attached to the mounting frame, there would be no need to additionally specify that the A-frame was connected to the mounting frame. If all terms in claim 45 are to be given meaning, the word “connected” must be interpreted to require a direct attachment between the A-frame and the mounting frame.

 Contrary to the majority’s assertions, see ante at 1342-43, the trial court’s claim construction requiring a direct connection between the A-frame and the mounting frame does not exclude an embodiment disclosed in the specification. Although the majority contends that the snowplow assembly described in figures six and seven of the specification shows a support frame which is "indirectly” connected to a mounting frame through a hitch arm, the specification never states that this indirect attachment is a "connection.” By contrast, the specification makes clear that the direct connection between the lift arm assembly and the mounting means (which does not include an intermediate connection through a hitch arm) is a "connection.” See '700 patent col. 4 11. 52-54.